IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT MURPHY,

v.                                          Civil No. JFM-13-2758

REPUBLIC NATIONAL DISTRIBUTING
COMPANY, LLC., et al.,

## MEMORANDUM

Plaintiff Robert Murphy ("Murphy") brings this suit against Republic National Distributing Company, LLC ("RNDC"), his former employer, for alleged violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623, *et seq.*, wrongful discharge, negligent hiring and retention, respondeat superior, and intentional infliction of emotional distress.  Murphy also asserts claims against individual defendants John Deitz, Gary Herd and Ned Parsons ("individual defendants")—who are all one-time and/or current employees of RNDC—for wrongful discharge and intentional infliction of emotional distress. RNDC now moves for judgment on the pleadings with respect to all claims except for Murphy's claim arising under the ADEA.  Individual defendants now move to dismiss the claims against them.  The parties have fully briefed the issues and no oral argument is necessary.  *See* Local Rule 105.6.  For the reasons set forth below, the motions will be granted.

## BACKGROUND

Murphy, a thirty year veteran of the wine and liquor sales industry, was employed by the alcohol distributor RNDC for seven years until he was fired on October 7, 2010.  According to Murphy—who was 63 years old when his tenure at RNDC ended—he was both fired, and

1

replaced, by employees who are at least twenty years younger than him. Prior to being fired, Murphy alleges that there were major internal and external problems at RNDC that marred his employment with the company. Internally, Murphy chafed at what he deemed the "ra-ra boys club" atmosphere perpetrated by his much younger superviser, Ned Parsons ("Parsons"). (Compl. ¶ 38; ECF No. 31 at 7). Parsons, Murphy alleges, permitted other workers to circulate pornography and explicit photographs in front of RNDC's female employees. Murphy also contends that Parsons regularly singled him out in front of his co-workers with degrading comments about his age. At various times during staff meetings and general office time, Parsons allegedly remarked that Murphy had "been around longer than dirt," came "from the dinosaur age" and "listen[ed] [to] Sinatra." (Compl. ¶ 13; ECF No. 31 at 4). According to Murphy, these comments formed part of a larger pattern of abuse, in which Parsons humiliated Murphy by implying that Murphy's sales performance suffered because of his age. Murphy additionally suggests, however, that Parsons' abuse stemmed from Parsons' latent resentment regarding Murphy's comparatively greater experience in—and familiarity with—the alcohol industry's standards, rules and regulations.

Parsons' workplace insensitivity, however—both in general and with respect to Murphy's age and experience—was the not the only basis for tension between Murphy and his superiors at RNDC. According to Murphy, Parsons sought to advance liquor sales and procure partnerships with various customers through a series of bribes and kickbacks. Although Murphy maintains that he (1) refused to distribute gift cards and cash handouts as instructed, and (2) brought an internal complaint regarding these practices in January 2010, Parsons allegedly disregarded these concerns and continued as before. Finding his RNDC superiors—including both John Deitz, RNDC's former president, and Gary Herd, Parsons' direct superviser in 2010—unreceptive,

Murphy funneled his protest through external channels, filing a whistleblowing complaint with the Maryland Comptroller later that year.  Around this time, Murphy alleges that RNDC reduced his salary, removed him from his former sales region and escalated the verbal abuse regarding his age.  The ensuing stress, Murphy contends, caused him to become sick and depressed, culminating in a severe health scare at a company meeting in August 2010, where Murphy suffered stroke-like symptoms and was transported to the University of Maryland Hospital's emergency room.  Unfortunately for Murphy, his relationship with his employer did not improve following this incident, and RNDC terminated his employment in October of that year.

Believing that RNDC improperly fired him both (1) because of his age, and (2) in retaliation for filing an external complaint regarding the company's sales practices, Murphy filed suit against RNDC, Parsons, Herd and Deitz on September 18, 2013, alleging violations under both state and federal law.  (ECF No. 1).  After Murphy filed a second amended complaint on June 19, 2014,[1] RNDC's subsequent answer incorporated its previous motion for judgment on the pleadings with respect to Counts II, III, IV, and V.  Similarly, in their answer to the second amended complaint, individual defendants incorporated their motion to dismiss with respect to Counts II and V.[2]

## STANDARD

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks

---

[1] Count I of Murphy's second amended complaint alleges an ADEA claim against RNDC only. Because RNDC moves for judgment only with respect to Counts II, III, IV and V—and because Count I does not allege a claim against individual defendants—individual defendants' arguments regarding Count I are not relevant to the outcome of the pending motions.
[2] *See supra* note 1.

and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted).  Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).[3]

## ANALYSIS

---

[3] The standard for a motion to dismiss under Rule 12(b)(6) also applies to a motion for judgment on the pleadings, brought under Rule 12(c).  *See Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To that end, judgment is appropriate "when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." *O'Ryan v. Dehler Mfg. Co.*, 99 F.Supp.2d 714, 717–18 (E.D.Va. 2000) (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 329 (4th Cir. 1997)).

I.       **Count II: Murphy's Claim for Wrongful Discharge in Violation of Maryland Public Policy, with respect to both RNDC and Individual Defendants**

In Count II of the amended complaint, Murphy alleges that defendants wrongfully discharged him in violation of Maryland public policy, by retaliating against him for reporting a whistleblowing complaint to the Comptroller of Maryland. According to defendants, however, Murphy has failed to identify with particularity any public policy allegedly violated by defendants' conduct that does not already provide Murphy with a civil remedy. For this reason, defendants argue that Murphy has failed to state a claim for wrongful discharge under Maryland tort law.[4]  I agree.

In Maryland, the tort of wrongful discharge arose as a narrow exception to the rule governing at-will employment. In general, an at-will employee, such as Murphy, enjoys an employment contract of infinite duration that is terminable, by either party, for any reason whatsoever. *Wholey v. Sears Roebuck*, 370 Md. 38, 48, 803 A.2d 48 (Md. 2002). When the motivation for an employee's termination breaches a "clear mandate of public policy," however, the employee may assert a claim for abusive or wrongful discharge. *See Terry v. Legato Systems, Inc.*, 241 F. Supp. 2d 566, 569 (D. Md. 2003).

To preserve the narrow scope of a wrongful discharge action, courts have imposed a high bar for plaintiffs attempting to state a claim. *See generally Ewing v. Koppers Co.*, 312 Md. 45, 49, 537 A.2d 1173, 1174 (Md. 1988) (observing that the wrongful discharge tort was intended to remedy "particularly reprehensible conduct"). A plaintiff must both "specifically identify" the

---

[4] Because Murphy's second amended complaint does not allege a federal cause of action against individual defendants, Deitz, Herd and Parsons urge the court to decline to exercise supplemental jurisdiction over his remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).  However, because I find that the values of judicial economy and convenience weigh in favor of the exercise supplemental jurisdiction in this instance, I will address Murphy's state law claims. *See generally Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

public policy that he alleges was violated, and establish that a "clear mandate of public policy" exists. *Terry*, 241 F. Supp. 2d at 569. To satisfy the "clear mandate of public policy" requirement, employees must locate the relevant public policy in a concrete source—namely: a "preexisting, unambiguous, and particularized pronouncement by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question"—rather than in conjecture or abstract interpretation. *Porterfield v. Mascari II, Inc.*, 142 Md.App. 134, 788 A.2d 242, 245 (2002); *see also Wholey*, 370 Md. at 52, 803 A.2d at 490 (cautioning courts to be "precise about the contours of actionable public policy mandates" and to limit permissible bases of public policy to "clear and articulable principles of law").

Imposing this exacting standard on what constitutes "a clear mandate of public policy," courts have reasoned, limits "judicial forays into the wilderness of discerning public policy without direction from a legislature or regulatory source." *Terry*, 241 F.Supp.2d at 569 (quoting *Milton v. IIT Research*, 138 F.3d 519, 523 (4th Cir. 1998)). Consequently, Maryland law only recognizes a wrongful discharge claim where the relevant public policy does not provide its own civil remedy. *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 561 A.2d 179, 180 (1989); *see also, e.g.*, *Terry*, 241 F. Supp. 2d at 571 ("[i]f the relevant public policy is contained in a statute, and the statute provides a remedy, the tort of wrongful discharge is not available."); *Wholey*, 370 Md. at 43, 57, 803 A.2d at 484, 492 (concluding that a Maryland statute—which included a remedy for public-employee whistleblowers—established a clear public policy protecting employees from termination for reporting suspected criminal activities to law enforcement, and thus could be the basis for a wrongful discharge claim brought by a private employee, since the statutory remedies were available for public employees only); *Molesworth v. Brandon*, 341 Md. 621, 628, 672 A.2d 608, 612 (Md. 1996) (finding that, because the Maryland Fair Employment

Practices Act (FEPA) provided a clear statement with respect to all employers who discriminate based on sex, it could be used as the basis for a wrongful discharge claim against an employer who, because it employed fewer than 15 people, was exempt from FEPA's remedies).

Because the wrongful discharge tort thus exists to provide relief to those who are injured by a public policy violation—but are otherwise unqualified to seek a civil remedy for that violation—a statute such as Title VII cannot provide the basis for a wrongful discharge claim. To allow otherwise would "interfere with the balancing of rights and adequacy of remedies determined by the legislature." *Porterfield*, 142 Md.App. at 603, 788 A.2d at 424.  Essentially a gap-filling measure, a viable wrongful discharge claim is thus most commonly available in two circumstances: (1) discharge for refusing to engage in an illegal activity and (2) discharge for exericising a specific legal right or duty. *Goode v. American Veterans, Inc.*, 874 F.Supp.2d 430, 442 (D.Md. 2012) (citing *Adler v. Am. Standard Corp.*, 830 F.2d 1303, 1307 (4th Cir. 1987)).

Here, Murphy has failed to state a plausible wrongful discharge claim for several reasons. As a preliminary matter, Murphy's claim is based upon his allegation that RNDC, Deitz, Herd and Parsons fired him in retaliation for Murphy's decision to inform the Maryland Comptroller of RNDC's alleged "wrongdoing."  According to Murphy, this "wrongdoing" consisted of Parsons' "illegal sales orders" and practice of providing kick-backs to prospective customers. (Compl. ¶ 18; ECF No. 31 at 6).  In particular, Murphy alleges that Parsons ordered his staff to distribute gift cards and cash incentives to customers in exchange for liquor sales.  Because he disapproved of these practices, Murphy refused to comply with Parsons' instructions and reported RNDC's practices both internally and externally.  Although Murphy argues elsewhere that RNDC fired him because of his age, he also maintains that his employer discharged him as a result of his whistleblowing activity.  In doing so, his amended complaint purports, RNDC and

individual defendants contravened the Maryland public policy articulated in § 20-602 of the Maryland State Government Annotated Code. (Compl. ¶ 25; ECF No. 31 at 5). Specifically, according to § 20-602:

> It is the policy of the State, in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers:
>
> (1) to assure all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and
>
> (2) to that end, to prohibit discrimination in employment by any person.

*Id.* Unfortunately for Murphy, § 20-602 cannot satisfy the public policy requirement of a wrongful discharge claim. Specifically, even assuming that § 20-602 prohibits the type of retaliatory firing that Murphy alleges, defendants correctly note that § 20-602 (like Title VII and the ADEA) has its own enforcement provision, and therefore cannot form the basis of a wrongful discharge claim. *See Goode*, 874 F.Supp.2d at 442 & n. 5, n. 6; *see also Jordan v. Alternative Resources, Corp.*, 458 F.3d 332, 349 (4th Cir. 2006) (concluding with respect to a Title VII claim, that "Maryland already provides statutory remedies for employees alleging retaliation").

In response, Murphy suggests that his wrongful discharge claim is predicated on additional sources of Maryland public policy beyond those explicitly identified by the second amended complaint. He does not, however, provide any case, statute or regulation—either in his amended complaint, or in his Opposition—that would permit the court to concretely identify the "clear, pre-existing mandate of public policy" to which he alludes. Instead, Murphy merely

reiterates that defendants violated Maryland public policy by firing him after he "report[ed] RNDC['s] alleged illegalities to government authorities." (ECF No. 26-1 at 1). By omitting any citation or support for this allegation, Murphy fails to "plead with particularity the source of the public policy" allegedly violated by RNDC's decision to terminate his employment. *Porterfield*, 142 Md.App. at 140, 788 A.2d at 245 (citations omitted). For this reason alone, he has not satisfied the requirements of a wrongful discharge claim and dismissal / judgment on the pleadings is appropriate.[5]

Moreover, Murphy has not alleged that he was discharged for (1) refusing to violate the law, or (2) attempting to exercise a specific legal duty or right. *See Adler*, 291 Md. At 42, 432 A.2d at 470; *see also Terry*, 241 F.Supp.2d at 571 (noting that courts have generally only recognized wrongful discharge claims in one of those two scenarios). Although Murphy maintains that Parsons directed RNDC sales personnel to pass out gift cards and cash incentives to prospective customers—and although Murphy alleges that he objected to this practice both internally and externally—Murphy does not argue that he was fired for refusing to follow Parsons' directions. Instead, he alleges that he was fired because he reported these illegal practices to the Maryland Comptroller. For this reason, Murphy has not demonstrated that his firing violated a clear mandate of public policy under Maryland law that courts have previously

---

[5] Maryland courts do recognize a clear public policy mandate—based in Md. Code, Art. 27, § 174—to protect employees "who report criminal activity to the appropriate [law enforcement] authorities and are subsequently discharged from employment on this basis." *Wholey*, 370 Md. at 70; 803 A.2d at 501. Murphy's inability to plead with particularly the source of the alleged public policy underlying his claim, however,—even after twice amending his complaint—makes it unnecessary to consider whether § 174 applies here to Murphy's wrongful discharge claim. I do observe, however, that Murphy has not alleged—and the record does not otherwise suggest— that his whistleblowing complaint resulted in charges against RNDC and/or Parsons. Although it is unclear what the ultimate probative value of this omission might be, in light of these factual uncertainties, I decline to speculate whether Murphy could have invoked § 174 had he sucessfully pleaded the source of public policy underlying his claim.

recognized as the basis of a viable wrongful discharge action. I will therefore grant RNDC's motion for judgment along with defendants' motions to dismiss Count II.

### II. Count III: Murphy's Negligent Hiring and Retention Claim with Respect to RNDC

According to Murphy, however, RNDC is also liable on a theory of negligent hiring and retention. Specifically, Murphy alleges that RNDC was aware of both (1) Parsons' objectionable sales practices and (2) Parsons' discriminatory treatment of older employees. It was thus foreseeable, Murphy alleges, that Parsons would continue this illegal conduct for the duration of his employment with RNDC. As defendant correctly points out, however, Murphy has failed to demonstrate that Parsons' actions constitute a common law tort that may serve as the predicate of a negligent retention claim. For this reason, Murphy has not stated a viable claim in Count III.

In Maryland, the tort of negligent hiring and retention requires Murphy to allege facts showing: (1) his injury was caused by the tortious conduct of a co-worker; (2) RNDC knew or should have known through the exercise of diligence and reasonable care that Parsons was capable of inflicting harm of some type; (3) RNDC failed to use proper care in selecting, supervising or retaining Parsons; and (4) RNDC's breach of its duty was the proximate cause of Murphy's injuries. *See generally, e.g.*, *Bryant v. Better Bus. Bureau of Greater Maryland*, 923 F.Supp. 720, 751 (D.Md. 1996).

Here, RNDC correctly observes that Murphy fails to establish the first required element of his claim—namely: that his injury was caused by Parsons' tortious conduct. As courts in this district have recognized on numerous occasions, the tortious conduct underlying a negligent retention claim must derive from the common law, and may only be predicated on common law claims. *See generally, e.g.*, *Bishop v. Board of Education of Calvert County*, No. 11-cv-1100, 2011 WL 2651246, at *28 (D.Md. Jul. 5, 2010); *Hammond v. Taneytown Volunteer Fire*

*Company*, CCB-09-0746, 2009 WL 3347327 (D.Md. Oct. 13, 2009); *Braxton v. Domino's Pizza LLC*, RDB-06-1191, 2006 WL 3780894 at *5–6 (D.Md. Dec. 21, 2006). As a result, an employee's Title VII violation may not form the basis for a negligent retention claim against the employer because Title VII claims are preempted by the Maryland Worker's Compensation Act ("MWCA"). Md.Code.Ann., Labor & Employ. Art, § 9–501 *et seq.*; *see also Bryant*, 923 F.Supp. at 751. Likewise, Murphy cannot state a claim for negligent retention based on Parsons' alleged age discrimination. Although age discrimination is remediable by federal statute, it is not a cognizable claim under Maryland common law. *Cf. Bryant*, 923 F.Supp. at 751.

Instead, Murphy argues that his negligent retention claim is predicated on Parsons' "illegal orders to Plaintiff, who refused and was attacked for his refusal . . . and then fired." (ECF No. 26-1 at 3). In other words, Murphy suggests that his negligent retention claim is based upon Parsons' tortious conduct in discharging Murphy in contravention of Maryland public policy. However, because Murphy fails to state a viable claim for wrongful discharge, he likewise cannot state a viable claim for negligent retention that is predicated on Parsons' decision to teminate Murphy's employment.[6] Judgment on Count III of Murphy's amended complaint is therefore appropriate.

### III. Count IV: Murphy's Respondeat Superior Claim with respect to RNDC

---

[6] Although Murphy's second amended complaint alleges that RNDC and individual defendants are liable for the tort of intentional infliction of emotional distress in addition to the tort of wrongful discharge, Murphy does not allege that defendants' intentional infliction of emotional distress formed the predicate for his negligent retention and/or respondeat superior claims against RNDC. In any event, because I find below that Murphy has failed to state a claim for intentional infliction of emotional distress with respect to either RNDC or individual defendants, this omission does not affect the outcome reached here.

In addition to his claims against RNDC for wrongful discharge and negligent retention, Murphy also alleges that his former employer is liable to him under a theory of respondeat superior. Under Maryland law, an employer may be held vicariously liable for the torts of an employee if the employee was acting within the scope of his employment when the tortious activity occurred. *See generally*, *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467 (Md. 1991). Because Murphy has failed to allege that RNDC's employee—Parsons—engaged in tortious conduct, however, Count IV of the amended complaint is decided in favor of RNDC.[7]

In order to state a viable claim for respondeat superior against RNDC, Murphy must show that he was injured by Parsons' tortious activity. Because Murphy maintains that his vicarious liability claim is distinct from his ADEA claim, he identifies Parsons' alleged retaliatory firing—which Murphy contends breached the common law rule against wrongful termination—as the basis for his respondeat superior claim against RNDC. As discussed above, however, Murphy has failed to state a wrongful discharge claim against individual defendants Parsons, Herd and Deitz. Consequently, Murphy's respondeat superior claim against RNDC may not be predicated upon his wrongful discharge action against Parsons. Because Murphy has failed to identify any other tortious conduct that could form the basis for his vicarious liability claim against RNDC, RNDC's motion for judgment on the pleadings is granted.[8]

### IV.   Count V: Intentional Infliction of Emotional Distress with respect to RNDC and Individual Defendants

---

[7] Notably, although respondeat superior liability also applies to Murphy's ADEA claim against RNDC, *see generally, e.g.*, *Causey v. Balog*, 929 F. Supp. 900, 905 (D. Md. 1996) —and although Murphy alleges that RNDC is independently liable for wrongfully discharging him in violation of Maryland public policy—Murphy emphasizes that his respondeat superior claim against RNDC is distinct from his ADEA claim because the predicate for his respondeat superior claim is the individual defendants' wrongful discharge of Murphy, whereas the predicate for his respondeat superior claim under the ADEA is Parsons' alleged age discrimination.

[8] *See supra* note 5.

Finally, Murphy seeks relief from both RNDC and individual defendants for emotional distress.  In Maryland, the tort of intentional infliction of emotional distress requires a plaintiff to allege facts showing that: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe.  *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002).   As courts in this district have observed on numerous occasions, "the tort of intentional infliction of emotional distress is rarely viable."  *Id.* (quoting *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997)); *see also The Estate of Ellen Alcade v. Deaton Specialty Hosp. Home, Inc.*, 133 F. Supp. 2d 702, 712 (D.Md. 2001) (reiterating that "[a] deficiency in any one [element] is fatal" to a plaintiff's prospective claim for intentional infliction of emotional distress); *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991) (citations omitted) ("Maryland courts have cautioned that the tort of intentional infliction of emotional distress should be imposed sparingly and 'its balm reserved for those wounds that are truly severe and incapable of healing themselves.'").

Here, because Murphy has not alleged facts showing that defendants' conduct was extreme or outrageous, he has failed to meet the pleading requirements for his claim.  *See, e.g.*, *Arbabi*, 205 F.Supp.2d at 465–66.  On the one hand, Murphy alleges that Parsons created a hostile environment at work in which Murphy was routinely subjected to derogatory comments about his age.  According to Murphy, Parsons variously remarked that Murphy had "been around longer than dirt," came "from the dinosaur age" and "listen[ed] [to] Sinatra."  (Compl. ¶ 13; ECF No. 31 at 4).  Parsons' misdeeds, however, were not limited to insensitive comments regarding Murphy's age; he allegedly permitted other workers to circulate pornography and explicit photographs in front of RNDC's female employees, and refused to stop his allegedly unethical

13

sales practices after he was confronted with an internal complaint.  As a result of this harassment and unprofessionalism, Murphy's physical, mental and emotional well-being suffered.  He points to one incident in which he was rushed to the hospital from a company meeting in August 2010 for treatment for a suspected stroke.  According to Murphy, this health scare was induced by the routine humiliation, stress and abuse he experienced at the hands of his RNDC superiors.

As one court in this district has observed, however, "as inappropriate and repulsive and workplace harassment is, such execrable behavior almost never rises to the level of outrageousness, and also never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress under Maryland law." *Arbabi*, 205 F.Supp.2d at 466.  Murphy has not alleged any physical invasion of his person, nor has he shown any other "truly repugnant intrusion on personal dignity" that Maryland courts have deemed sufficient to state a claim for emotional distress. *Id.* (collecting cases).  Although Murphy's second amended complaint identifies several instances in which Parsons engaged in objectionable conduct, Parsons' remarks—while certainly obnoxious and arguably abusive—fail to rise to the level of "outrageous" conduct needed to state a claim for intentional infliction of emotional distress.  As a result, I will grant RNDC's motion for judgment as well as individual defendants' motion to dismiss Count V.

## CONCLUSION

For the aforementioned reasons, both RNDC's motion for judgment on the pleadings with respect to Counts II, III, IV and V, and individual defendants' motion to dismiss with respect to Counts II and V are granted.   A separate order follows.

|  |  |
|---|---|
| _____09/05/2014_____<br>Date | _____/s/_____<br>J. Frederick Motz<br>United States District Judge |